**SIGNED THIS: December 9, 2021**

_____
**Mary P. Gorman**
**United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 19-70433 |
| TARIEA TANYA KINCAID, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |

## O P I N I O N

Before the Court is the United States Trustee's Motion for a Determination of Reasonable Value of Services of Debtor's Attorney and for Sanctions. The United States Trustee requests that the retention agreement entered into between the Debtor and her attorney be canceled, that the attorney be ordered to disgorge the fees he or his law firm received, and that the attorney be sanctioned for his conduct in this case. For the reasons set forth herein, the relief requested will be granted.

## I. Factual and Procedural Background

Tariea Tanya Kincaid ("Debtor") filed her voluntary Chapter 7 petition on March 25, 2019. She was represented in the filing by Attorney Karl Niebuhr of the Niebuhr Law Firm. In the Disclosure of Compensation of Attorney for Debtor included with the petition, Mr. Niebuhr stated that he received his full fee of $365 prior to filing the Debtor's case. The payment was also disclosed in response to question 16 of the Debtor's Statement of Financial Affairs, although the date of payment was omitted.

In her Statement of Intention for Individuals Filing Under Chapter 7 ("Statement of Intention") included with her bankruptcy paperwork, the Debtor stated her intention to retain a 2015 Dodge Charger automobile and a residential property located at 1925 Holly Drive, Springfield, Illinois, and to enter into reaffirmation agreements for the debts secured by such property. The Statement of Intention identified Citizens Equity First Credit Union ("CEFCU") as the creditor secured by the Dodge Charger and Ocwen Federal Bank and SPS Select Portfolio Servicing as the creditors with liens on 1925 Holly Drive.[1]

James Inghram was appointed as case trustee ("Trustee"). Shortly after the creditors meeting was concluded in May 2019, the Trustee filed a report of no distribution. The Debtor received her discharge on July 3, 2019, and the case was closed July 19, 2019.

---

[1] The Statement of Intention also included a checked box indicating the Debtor's intention to redeem the real estate.

On June 4, 2021, the Trustee filed a Motion to Reopen Bankruptcy Case. According to the Motion to Reopen, the Debtor contacted the Trustee in March 2021 to inform him that the social security number listed on her bankruptcy petition was incorrect and that she had repeatedly asked her attorney to correct the issue to no avail. The Motion to Reopen asked that the bankruptcy case be reopened so that the Debtor's social security number could be corrected and to authorize the United States Trustee ("UST") to appoint a case trustee to ensure that the Debtor's attorney complied with his obligations to assist the Debtor. Because the Motion to Reopen was filed using Mr. Inghram's trustee electronic-filing credentials, the filing fee to reopen the case was deferred.

Hearing on the Motion to Reopen was held June 15, 2021. Attorney Leann Niebuhr of the Niebuhr Law Firm appeared in place of Mr. Niebuhr.[2] The Trustee and the Debtor also appeared at the hearing. When asked about the status of correcting the Debtor's social security number, Ms. Niebuhr said:

> We have notified all the creditors and the credit reporting agencies, but we haven't been able to decide who should pay the Motion to Reopen filing fee between ourselves and the Debtor. So everything is ready to be filed; it's just a matter of, if you do allow this Motion to Reopen, she does need to pay the filing fee.

The Trustee candidly acknowledged his obligation to review the Debtor's social security number and said that he should have caught the error. He explained

---

[2] This Court does not condone appearances by law firm and requires individual attorneys to enter appearances on behalf of their clients. *See* Fed. R. Bankr. P. 9010(b). Nevertheless, the Niebuhr Law Firm has made it their practice to sign and file documents under Karl Niebuhr's name and electronic-filing credentials as the attorney of record but then have Leann Niebuhr appear at hearings on the firm's and their clients' behalf. Ms. Niebuhr generally appears without entering a formal appearance despite the Court's practice of requiring appearances and compliance with the rules regarding disclosure of compensation by all attorneys representing debtors.

that he filed the Motion to Reopen because of his own failure to catch the error. He mistakenly thought that he had paid the fee for the motion when it was filed. Highlighting that the payment of the filing fee was an issue that needed to be resolved, the Court granted the Motion to Reopen and admonished Ms. Niebuhr that mistakes of the type made here must be corrected and that she needed to get the social security number issue straightened out promptly.

Six weeks later, Mr. Niebuhr filed an Amended Debtor's Statement of Social Security Number and Amended Voluntary Petition to Correct Debtor Information on the Debtor's behalf. Thereafter, the Debtor filed correspondence stating that her attorneys were supposed to facilitate the execution of reaffirmation agreements with her lenders before the case was originally closed but did not and were now telling the Debtor that she needed to pay for additional services.

Based on what had come to light in the reopening of the Debtor's bankruptcy case, the UST filed her Motion for a Determination of Reasonable Value of Services of Debtor's Attorney and for Sanctions ("Sanctions Motion"). The Sanctions Motion asks the Court to cancel the retention agreement between the Debtor and her attorney and require the refund of fees paid to the extent the Court determines such fees are not reasonable. The Sanctions Motion further asks the Court to impose such sanctions as warranted to deter future violations of the Bankruptcy Code.

At a subsequent hearing on the status of the payment of the filing fee for the Motion to Reopen, the Court acknowledged the filing of amended

-4-

documents regarding the Debtor's social security number but pointed out that the filing fee had still not been paid. The Court also noted the filing of the UST's Sanctions Motion. Ms. Niebuhr, again appearing on behalf of the Niebuhr Law Firm, took the position that there was blame to go around for the social security number error and argued that, although attorneys for debtors have a duty to verify such information, the failure of both the Debtor and the Trustee to catch the mistake made them primarily liable for the error. She contended that she and Mr. Niebuhr had fulfilled their obligations in representing the Debtor and said that the only reason the situation had reached the point that it had was because the Debtor refused to pay the filing fee to reopen the case.

The Debtor, appearing at the hearing on her own behalf, expressed her dismay that she would be held responsible for the Niebuhrs' mistake when she initially gave them a copy of her social security card with the correct number and brought the mistake to their attention when later discovered. She added that there were other issues with the legal services she received in that some creditors may have been excluded from the case and reaffirmation agreements she signed were never filed. The matter was continued for further status along with hearing on the Sanctions Motion. The Court encouraged Ms. Niebuhr to include itemized time records of services rendered with any response to the Sanctions Motion.

Prior to the hearing, the Trustee paid the filing fee for the Motion to Reopen and Mr. Niebuhr filed a response to the Sanctions Motion. In his response, Mr. Niebuhr acknowledged the error in the Debtor's social security

number but sought to avoid responsibility by pointing to the failure of the Debtor and the Trustee to catch the mistake. Included in the response was a bare-bones itemization of time and services purportedly rendered in connection with the case. Contrary to the assertions in the Sanctions Motion and of the Debtor herself, Mr. Niebuhr contended that the Debtor did not contact the Niebuhr Law Firm about the error in her social security number until the day after her case was closed and that the parties communicated "at least one hundred times" from July 2019 through December 2020.

The hearing on the Sanctions Motion and the payment of the Motion to Reopen filing fee was held as scheduled. The Trustee did not appear for the telephonic conference, but the Court noted that he had paid the filing fee for the Motion to Reopen and that further status on that issue was not necessary. Ms. Niebuhr, the Debtor, and the attorney for the UST did appear. As to the Sanctions Motion, the Court noted Mr. Niebuhr's response disputing many of the material allegations in the Sanctions Motion and therefore set the matter for an evidentiary hearing to be held by video conference.[3]

The video hearing was held as scheduled. The UST's case consisted of testimony from three witnesses: the Debtor, the Trustee, and Karl Niebuhr. The Debtor testified first. She acknowledged retaining Mr. Niebuhr to represent her in her bankruptcy filing for an agreed fee of $365. According to the Debtor, the scope of services included in their agreement was not limited in any way. She

---

[3] In setting the matter for evidentiary hearing, the Court entered its standard trial order and a corresponding order regarding video conference procedures. Among other things, the video procedures order specifically prohibited witnesses testifying remotely from communicating with any person other than the attorney questioning them and from even being in the same room as their attorney or any other person while testifying.

explained that when she initially contacted the Niebuhr Law Firm, she was directed to go to the law firm's website and print and complete an application, which she did. The Debtor then returned the completed paperwork to the Niebuhr Law Firm and was subsequently asked to pay the fee. In response to the UST's attorney's question about how much time she had spent with the Niebuhrs discussing her case or going over documents, the Debtor plainly answered, "None." Upon furthering questioning by the Court, the Debtor said that she never met face-to-face with anyone from the Niebuhr Law Firm before her case was filed. She stated that they would hardly talk to her on the phone and that their communications were mostly by text and email. According to the Debtor, no one from the Niebuhr Law Firm went over her paperwork with her at any point before filing and, importantly, no one asked her to review her paperwork to make sure that key information such as her name, address, and social security number was correct.

The Debtor testified as to her intention to reaffirm certain debts that were secured by property she wished to retain. She said that she signed several reaffirmation agreements and returned them to the Niebuhrs, but the agreements were apparently never signed by the respective creditors. According to the Debtor, when she later spoke to a representative of one of the creditors, she was told that they had no record of any such agreement being received from the Niebuhr Law Firm.

Sometime after her case was filed, the Debtor realized her social security number was wrong on her petition. She said she contacted the Niebuhrs, but

they refused to fix the error and told her she would have to pay to reopen her closed case to correct matters. She did not dispute Mr. Niebuhr's assertion in the time records included with his response that she had contacted him "on or about" July 20, 2019—the day after the case was closed—and tried contacting him "at least one hundred times" between then and December 2020. The Debtor said she realized the Niebuhrs had blocked her calls or were screening her telephone number when, after countless attempts using her own phone, she was able to reach the law firm from a different telephone number.

The Debtor claimed that the social security number issue negatively impacted her credit, and several lawsuits to collect prepetition debts were initiated against her notwithstanding the discharge entered in her bankruptcy case. Unable to obtain help from the Niebuhrs, the Debtor reached out to the Trustee because his contact information was on many of her bankruptcy records. The Debtor testified that, although many of the issues related to the social security number error were ultimately corrected, it was not without some effort and expense for the Debtor; she had to respond to and defend against the lawsuits without the aid of her attorney.

The Trustee testified as to his role as case trustee and the specific events of the Debtor's bankruptcy case, as well as his general experience in the practice of bankruptcy law. After holding the creditors meeting in this case and investigating the Debtor's financial circumstances, the Trustee determined that there were insufficient assets of the bankruptcy estate to distribute to creditors

and therefore filed a report of no distribution. The Debtor was granted a discharge, and her case was closed.

The Trustee filed the Motion to Reopen in June 2021 after the Debtor called and informed him that the social security number listed in her bankruptcy paperwork was incorrect, that some of her creditors were not included in the case, that she was being sued by a number of creditors, and that her attorney would not return her phone calls. He believed that the Debtor may have also raised the issue she had with the reaffirmation agreements not being completed at that time. After investigating the Debtor's claims and concluding that they were credible enough to warrant his taking action, the Trustee decided to reach out to the attorneys prosecuting the collection actions against the Debtor to inform them of the Debtor's bankruptcy case and resulting discharge order. He also filed the Motion to Reopen the Debtor's bankruptcy, believing he had paid the fee only to realize later that the fee had been deferred because he filed the motion using his trustee electronic-filing credentials. He ultimately paid the filing fee.

The Trustee testified that he has been a panel trustee for "twenty-some years" and has occasionally represented debtors in that time as well.[4] In his experience, the Trustee did not recall ever having to deal with a situation where a case was closed before it became apparent that a debtor's social security number was incorrectly listed. He said that, generally, social security numbers

---

[4] Based on the Trustee's experience, the UST's attorney proffered him as an expert for purposes of giving his opinion about handling bankruptcy matters. Mr. Niebuhr did not object, and the Trustee was allowed to testify as an expert in the practice of bankruptcy law in the Central District of Illinois.

can be obtained or verified from tax documents provided by debtors, but it had become common during the COVID-19 pandemic to ask for and retain a photocopy or image of a debtor's social security card. The Trustee explained that this information can be used to verify other financial information about debtors; he runs a public records search in every case and cross-checks that with the information provided on debtor intake forms or filed in the bankruptcy case to make sure that no assets or creditors are omitted. In his opinion, it would not be reasonable to rely on all the information provided by debtors as fact—attorneys must independently investigate the accuracy of information that is provided to them. Still, he stated that it is not uncommon that information ultimately included in a debtor's petition or schedules would need to be corrected.

When representing debtors, it is his practice to encourage his clients to contact him with any and all concerns or questions about their case or the bankruptcy process. Asked about the proper course of action for a debtor's attorney to take if their client were to contact them post-discharge about a creditor filing a lawsuit to collect a debt, the Trustee stated that it is his practice to notify the creditor and their attorney of his client's bankruptcy case and discharge order.

The Trustee opined that, in a case of similar complexity to the Debtor's case here, he would spend several hours of time preparing and filing the petition and related paperwork, meeting with the debtor throughout. He said he typically would meet with the prospective client to discuss and determine

whether and what type of bankruptcy relief would be appropriate, in which case he would then enlist the client to gather information about their finances, review that information with the client at a second meeting, and prepare the bankruptcy documents and try to independently verify their accuracy before meeting with the client again to review the prepared documents before filing. In reviewing the itemization of time and services provided in Mr. Niebuhr's response to the UST's Sanctions Motion, the Trustee said that it did not reflect an amount of time that would give him comfort in the adequacy of the services provided. Specifically, he expressed concern that the roughly two hours purportedly spent reviewing and discussing information with the Debtor was insufficient and noted that there appeared to be no time expended reviewing the Debtor's tax returns and bank statements or searching public records.

Karl Niebuhr was called as an adverse witness. Mr. Niebuhr acknowledged that the Debtor had retained his services to represent her in this bankruptcy case and agreed with the suggestion of the UST's attorney that his agreement to provide legal services to the Debtor was not limited in scope. Mr. Niebuhr admitted that the scope of the legal services he agreed to provide would have included defending the Debtor in adversary proceedings and the filing of reaffirmation agreements, though he said the latter would depend on the creditor returning the signed agreement to him.

Asked what protocol he follows when a debtor's discharge date is approaching while he is waiting for a reaffirmation agreement to be executed and returned by a creditor, Mr. Niebuhr stated, "Normally the creditor will send

me two notices before a bankruptcy ends and then we will try and figure that out." In response to more specific questioning about whether he had ever filed a motion to extend time and delay the entry of a discharge to facilitate the timely filing of a reaffirmation agreement, Mr. Niebuhr said he had not and confirmed that the same was true in this case; no motion to extend the Debtor's discharge date was ever prepared and filed. Mr. Niebuhr acknowledged that the Debtor's Statement of Intention, which he prepared, signaled her intent to retain certain property and enter into reaffirmation agreements for the secured debts owed to CEFCU, Ocwen Federal Bank, and SPS Select Portfolio Servicing. Mr. Niebuhr conceded that the form indicated the Debtor's intention of both reaffirming the debt owed to Ocwen Federal Bank and redeeming the property subject to the debt. When confronted with the inconsistent assertions, Mr. Niebuhr responded, "If [the Debtor] signed it, then, yes, that's what she intended to do."

Comparing the Statement of Intention to Mr. Niebuhr's time entries, which show the preparation of three reaffirmation agreements for CEFCU and another for US Bank, Mr. Niebuhr saw no discrepancies. He agreed that three agreements were prepared for CEFCU and suggested that US Bank was the same as Ocwen Federal Bank or was a servicer thereof. As for the absence of time entries relating to the preparation of an agreement for SPS Select Portfolio Servicing, Mr. Niebuhr cryptically asserted that he "did not receive those from the creditor."

Asked about the manner in which he obtained the Debtor's social security number, Mr. Niebuhr answered, "I believe it was a photo of her social security number . . . Oh, I'm sorry it's a fax . . . or an email." At that point, it became apparent to the Court that Mr. Niebuhr was looking to someone off-camera for answers. The Court interrupted the UST's attorney's questioning to confront Mr. Niebuhr about whether he was alone in the room. Mr. Niebuhr acknowledged Ms. Niebuhr's presence and said that she was showing him his computer screen.[5] The Court noted that it had failed to ask Mr. Niebuhr at the outset of his testimony whether he was alone in the room but pointed out that the video procedures order entered in anticipation of the hearing clearly required that he not be in the room with anybody else and that Ms. Niebuhr must leave the room. Mr. Niebuhr was allowed to continue testifying once he confirmed that Ms. Niebuhr had exited the room.

According to Mr. Niebuhr, he mistakenly transposed the last four digits of the Debtor's social security number with her telephone number, which were next to each other on the intake questionnaire completed by the Debtor. Asked whether it usually takes him two years to correct an issue in a closed case, Mr. Niebuhr did not directly answer the question. Instead, he sought to defend the delay in this case by contending that there was a dispute about who would pay the fee.

When asked to identify the ways in which he ensures that his clients' prepetition creditors and obligations are included on their bankruptcy petition

---

[5] Mr. Niebuhr appeared to be testifying from a couch or lounge chair, apparently not situated directly in front of a desk or workstation equipped with a computer.

and schedules, Mr. Niebuhr stated that he always gets a copy of a credit report, that he instructs the client to collect and turn over to him all bills they receive over the course of a few months, and that the client then reviews and signs the paperwork he prepares before it is filed. He said that he did obtain a copy of a credit report in preparing the Debtor's petition and schedules in this case. As for why his time entries did not reflect as much, Mr. Niebuhr stated that he did not have direct memory of the Debtor's case, but, generally, if there is no discrepancy between the credit report and the information provided by his client, he does not go through it with the client and therefore would not have a time entry for any review. He said he also received a copy of the Debtor's tax returns prior to filing but was unsure whether he received a copy of her W-2 tax forms.

With regard to his billing practices, Mr. Niebuhr said that he bills a flat fee and only goes back to create itemized time entries if requested to do so. He said that, in such instances, he recreates time entries from case notes that he makes in his file contemporaneously with the work being done, breaking down his time into fifteen-minute increments. Asked what he does if a task only takes five minutes, Mr. Niebuhr replied, "I've never done a service that only takes five minutes." When the UST's attorney called his attention to the first entry included in his itemization that asserted fifteen minutes of clerical time on January 18, 2019, for "Questionnaire rcd. From Debtor," Mr. Niebuhr claimed that it meant "Questionnaire READ from Debtor" and that the time

was spent reviewing the questionnaire.[6] In terms of his time spent reviewing items with the Debtor, Mr. Niebuhr admitted that he did not meet with the Debtor in person. He said that he discussed and reviewed matters with her over the telephone. But he also conceded that he did not go over the paperwork with her line by line.

Mr. Niebuhr did not present any evidence at the hearing and chose not to cross examine the Debtor or the Trustee. He did, however, reiterate that he disagreed with the Debtor's assertion that he did not speak with her before filing her case. When asked by the Court why he failed to pay the reopening fee and correct his mistake before the matter got this far, Mr. Niebuhr raised his voice and became visibly angry, asserting that he would have paid the fee if he had known that was the rule.

The Court took the issues under advisement. The matter is now ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). The review of attorneys' transactions with debtors and the determination of appropriate sanctions in connection therewith relate

---

[6] Notably, another clerical entry from January 23, 2019, indicates fifteen minutes of time for "Payment rcd. from Debtor." Surely, Mr. Niebuhr would not contend that the description for this entry should be construed as "Payment READ from Debtor."

to the administration of the bankruptcy case and are core proceedings. 28 U.S.C. §157(b)(2)(A). The issues before the Court arise in the bankruptcy and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### III. Legal Analysis

The UST correctly asserts that this Court has broad power to review a debtor's financial transactions with their attorney and to order disgorgement when fees paid to an attorney are excessive. Attorneys must disclose their financial transactions with debtors even when they do not intend to seek compensation from the estate. 11 U.S.C. §329(a); Fed. R. Bankr. P. 2016(b). Any party in interest may ask a court to review fees paid to an attorney in connection with the filing of a petition under the Bankruptcy Code to determine whether such fees are excessive. Fed. R. Bankr. P. 2017(a). When fees exceed the reasonable value of the services provided, the fee agreement may be canceled and disgorgement of excessive fees may be ordered. 11 U.S.C. §329(b). This Court's authority to review the Debtor's transactions with Attorney Niebuhr and the Niebuhr Law Firm in this case is therefore clear. Mr. Niebuhr does not contend otherwise.

The District Court for the Central District of Illinois has adopted the Rules of Professional Conduct as promulgated by the Illinois Supreme Court to govern practice in all federal courts within the District. CDIL-LR 83.6(D). Under

those rules, an attorney is required to provide competent representation to clients, and competent representation is defined as requiring the "legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Ill. R. Prof'l Conduct (2010) R. 1.1 (eff. Jan. 1, 2010). Attorneys are also prohibited from charging or collecting unreasonable fees. Ill. R. Prof'l Conduct (2010) R. 1.5(a) (eff. Jan. 1, 2010). Attorneys may not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal[.]" Ill. R. Prof'l Conduct (2010) R. 3.3(a)(1) (eff. Jan. 1, 2010).

In Chapter 7 cases, the required professional standards also include the mandates of §707(b)(4) of the Bankruptcy Code, which provides, in part:

> (C) The signature of an attorney on a petition, pleading, or written motion shall constitute a certification that the attorney has—
>
>> (i) performed a reasonable investigation into the circumstances that gave rise to the petition, pleading, or written motion; and
>>
>> (ii) determined that the petition, pleading, or written motion—
>>
>>> (I) is well grounded in fact; and
>>>
>>> (II) is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law and does not constitute an abuse under paragraph (1).
>
> (D) The signature of an attorney on the petition shall constitute a certification that the attorney has no knowledge after an inquiry that the information in the schedules filed with such petition is incorrect.

11 U.S.C. §707(b)(4)(C), (D).

Also pertinent to the discussion of professional standards is Bankruptcy Rule 9011, which provides, in part:

> (b) Representations to the Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, —
>
> . . .
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and]
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Fed. R. Bankr. P. 9011(b)(2), (3).

It is also important to note that attorneys for debtors are debt relief agencies. *Milavetz, Gallop & Milavetz, P.A. v. U.S.*, 559 U.S. 229, 235-36 (2010). As such, debtors' attorneys are subject to the provisions of §526(a) that provide, in part:

> (a) A debt relief agency shall not—
>
> (1) fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title;

(2) make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading; [or]

(3) misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to—

(A) the services that such agency will provide to such person; or

(B) the benefits and risks that may result if such person becomes a debtor in a case under this title[.]

11 U.S.C. §526(a)(1)-(3).

Section 526 provides its own remedies for violations. If a debtor's attorney violates the restrictions on debt relief agencies, whether intentionally or negligently, the attorney may be required to disgorge fees and reimburse their client for actual damages and attorney fees. 11 U.S.C. §526(c)(1), (2)(A). Civil penalties and injunctive relief are also available. 11 U.S.C. §526(c)(5). Further, attorneys must enter into written contracts with their debtor clients, and those contracts must spell out the services to be provided. 11 U.S.C. §528(a)(1)(A).

Taken together, the above provisions require an attorney representing a debtor in bankruptcy to thoroughly interview the client, to require the client to produce relevant information, to review the client's financial documents and other information provided, and to resolve any inconsistencies or questions

before filing the case. *In re Tatro*, 2020 WL 534715, at *5-6 (Bankr. C.D. Ill. Jan. 31, 2020). The attorney must "make a reasonable inquiry as to the circumstances giving rise to the bankruptcy petition and all facts asserted therein." *In re Beinhauer*, 570 B.R. 128, 136 (Bankr. E.D.N.Y. 2017). The attorney must inform debtor clients of the information required to be provided because the "attorney is the expert and cannot rely upon a client's limited understanding of what constitutes 'complete' or 'necessary' information[.]" *Dignity Health v. Seare (In re Seare)*, 493 B.R. 158, 211 (Bankr. D. Nev. 2013). Likewise, "[a] bankruptcy lawyer cannot assume that a client knows what a bankruptcy will or will not do for her[;]" that is why the advice of bankruptcy lawyers is sought. *Id.* at 189. An attorney's obligations are not lessened if a debtor does not request a personal meeting or ask detailed questions about the bankruptcy process. *In re Moffett*, 2012 WL 693362, at *4 (Bankr. C.D. Ill. Mar. 2, 2012).

Here, Mr. Niebuhr agreed to represent the Debtor in her bankruptcy without limitation for a modest fee. In addition to analyzing the Debtor's financial situation, discussing the Debtor's goals, advising on the best course of action, and preparing and filing the petition, related schedules, and any other document necessary to accomplish the Debtor's goals, the UST contends that the scope of services to be provided by Mr. Niebuhr also necessarily included using the correct social security number for the Debtor on her petition and listing all of her creditors and prepetition obligations. Because Mr. Niebuhr did not use the correct social security number, the UST says that the Debtor's

"fresh start" was marred by credit reporting issues and lawsuits over ostensibly discharged debts. Of course, mistakes do happen, but "[o]nce a question has been raised about the reasonableness of the attorney's fee under section 329, it is the attorney himself who bears the burden of establishing that the fee is reasonable." *In re Geraci*, 138 F.3d 314, 318 (7th Cir. 1998) (citations omitted). Mr. Niebuhr has failed to meet the required standards for practice and did not meet his burden to show that his fees were reasonable.

## A. Social Security Number

The UST's main complaint against Mr. Niebuhr is that he failed to correct the error that he made in reporting the Debtor's social security number on her petition. The Debtor spent over two years trying to get Mr. Niebuhr to help her fix the problem that he created, but she was not able to get his attention until she involved the Trustee and the Court. There is no question but that Mr. Niebuhr had a duty to help the Debtor and fix his own error. His failure to do so violated the Bankruptcy Rules and his ethical duties to his client.

Bankruptcy Rule 1007(f) requires individual debtors to provide a verified statement setting forth their social security number with their petition. Fed. R. Bankr. P. 1007(f). This is important for several reasons; an individual's social security number is instructive in confirming the identity of a debtor, their financial history, and their eligibility for relief under the Bankruptcy Code. It helps guard against abuse of the bankruptcy process. Numerous courts have held that providing an incorrect social security number constitutes a material

misrepresentation that may be grounds for denying or revoking a debtor's discharge. *See, e.g.*, *In re Skinner*, 2014 WL 5092284, at *6 (Bankr. D. Neb. Oct. 9, 2014) (citations omitted); *In re Minetos*, 248 B.R. 729 (Bankr. S.D.N.Y. 2000) (discharge revoked due to failure to timely correct typographical error in debtor's social security number).

The importance of providing accurate information about a debtor's social security number cannot be understated. And in the event that a social security number submitted under Bankruptcy Rule 1007(f) is discovered to be incorrect, Bankruptcy Rule 1009(c) creates an affirmative duty for the debtor to "promptly submit an amended verified statement setting forth the correct social security number" and provide notice of the amendment to all creditors in the case. Fed. R. Bankr. P. 1009(c).

Mr. Niebuhr does not dispute that he made a mistake when copying the Debtor's social security number from the client intake questionnaire to her bankruptcy petition. And he admits that the mistake was his; the Debtor had provided him with a copy of her social security card. He said he transposed the last four digits with those of the Debtor's telephone number. The mistake went unnoticed until the Debtor had been granted a discharge and her case was closed. But when the Debtor noticed the error and brought it to his attention, Mr. Niebuhr took no action to correct the error for more than two years. When he finally did prepare amended documents to correct the error, it was not until several weeks after the Trustee had requested that the case be reopened and the Court had instructed Ms. Niebuhr to fix the error.

The Niebuhrs claimed to have notified the Debtor's creditors and the credit reporting agencies of the social security number issue when brought to their attention, but Mr. Niebuhr provided no evidence to support that assertion. Likewise, Mr. Niebuhr presented no authority for the proposition that any of the credit reporting agencies would have changed their reports based on such communications when the public records originally relied upon had not been corrected. To the contrary, the Debtor said that her credit reports continued to show her debts as past due rather than discharged.

Regardless of the Niebuhrs' claims of contacting the credit reporting agencies, Bankruptcy Rule 1009(c) creates an affirmative duty to file an amended statement of social security number to correct errors. The fact that the rule refers to obligations of the "debtor" is of no consequence. Attorneys that agree to represent individual debtors in consumer bankruptcy cases cannot avoid responsibility for their own mistakes in rendering agreed upon services because the Bankruptcy Code and Rules refer to specific obligations of the "debtor." Rather, Bankruptcy Rule 1009(c) and Rule 3.3(a)(1) of the Illinois Rules of Professional Conduct, read together, clearly required that Mr. Niebuhr correct the Debtor's social security information when he learned it was inaccurate. Fed. R. Bankr. P. 1009(c); Ill. R. Prof'l Conduct (2010) R. 3.3(a)(1) (eff. Jan. 1, 2010). Mr. Niebuhr's inaction constituted a violation of his professional obligations.

Still, Mr. Niebuhr defends his inaction by blaming the Debtor for refusing to pay the filing fee to reopen her case and both the Debtor and the Trustee for

Case 19-70433   Doc 59   Filed 12/09/21   Entered 12/09/21 11:11:08   Desc Main
                    Document     Page 24 of 36

not catching his mistake before the case was closed. He seems to think that he and Ms. Niebuhr fulfilled their obligations to their client and that nothing more was required of them. To the contrary, in addition to assisting his client in correcting her social security number, it was ultimately Mr. Niebuhr's responsibility to check his own work and to diligently go through the documents he prepared with the Debtor. Ill. R. Prof'l Conduct (2010) R. 1.1 (eff. Jan. 1, 2010). He certified that he had done as much by signing and filing the petition and related documents. Fed. R. Bankr. P. 9011(b) (by presenting papers to the court, an attorney is certifying that, after reasonable inquiry, the factual contentions therein have evidentiary support). His conduct to the contrary violated his professional obligations.

The Debtor testified that no one from the Niebuhr Law Firm ever went over her bankruptcy paperwork with her at any time prior to filing and that what limited communication she did have with the Niebuhrs was mostly by text or email. Of course, Mr. Niebuhr disputes that testimony, claiming instead that, while he did not meet with the Debtor face-to-face, he did review the paperwork with her in detail over the telephone. When confronted by the Court about whether it was his practice—prior to the COVID-19 pandemic—to not meet with clients, Mr. Niebuhr said he would not make clients meet in person if they did not want to. The practice of attorneys failing to meet with their clients in person or by video conference is one that the Court has criticized before as leading to inaccuracies in debtors' paperwork and as failing to comply with the minimum standards of professional responsibility. *In re Finn*, 2020 WL

6065755, at *9 (Bankr. C.D. Ill. Aug. 28, 2020); *Moffett*, 2012 WL 693362, at *4. The problems here reinforce the Court's belief that it is virtually impossible for an attorney to competently represent a debtor in a consumer bankruptcy case when communication is limited to phone, texts, and emails only.

The Court did not find Mr. Niebuhr to be a credible witness. He repeatedly side-stepped directly answering the UST's attorney's questions, and at least some of the answers he did give were very clearly being fed to him by Ms. Niebuhr in violation of the video procedures order. His explanation of documentary evidence—like his assertion that the Debtor intended to both redeem property and reaffirm the related debt which obviously was a typographical error—was disingenuous at best. Under the circumstances, Mr. Niebuhr's unsubstantiated, self-serving assertions that he discussed matters in detail with the Debtor over the phone carry little weight.

To the contrary, Mr. Niebuhr's dismissive attitude was entirely consistent with the Debtor's testimony that her attorneys were basically ignoring her and with the Trustee's testimony about the steps he took in moving to reopen her case to address the problems. What little Mr. Niebuhr did to ensure the accuracy of the information provided in the Debtor's bankruptcy paperwork and to correct issues later discovered was obviously not enough and fell below required standards. In agreeing to represent the Debtor but then preparing and presenting documents for her signature without a meaningful discussion or review of the details therein, Mr. Niebuhr violated his duties under §526(a)(2).

Had Mr. Niebuhr been careful in checking over his own work and been diligent in thoroughly reviewing the paperwork he had prepared with the Debtor—even if over the phone—he might have avoided having to correct the resulting errors after the fact. And, if nothing else, had Mr. Niebuhr simply taken responsibility for his error by promptly moving to reopen the case and tendering the associated filing fee, he might have avoided the resulting scrutiny of his fees. But he did not, and Mr. Niebuhr's compounding failures constitute serious violations of his obligations under §526(a)(2) and Rule 1.1 of the Illinois Rules of Professional Conduct. *Finn*, 2020 WL 6065755, at *9.

At the hearing, Mr. Niebuhr contended that he would have paid the filing fee had he known that was the rule. The implication of Mr. Niebuhr's assertion is that the Court had a duty to set rules for situations such as this so that he would have known that he had to pay the fee required to fix his mistake. His argument is not persuasive but instead highlights his utter lack of acceptance of responsibility for his sloppy practices.

Mr. Niebuhr was retained by the Debtor to represent her in her bankruptcy filing without limitation. In preparing the Debtor's paperwork, Mr. Niebuhr made a mistake resulting in an incorrect social security number being used for the Debtor. It was ultimately his responsibility to verify the information the Debtor had provided and to doublecheck his own work. Mr. Niebuhr failed in that regard. And his lack of thoroughness and diligence marred the Debtor's fresh start and deprived her, at least for some time, of the primary benefits of obtaining a discharge. Even more problematic is the fact

that he believes he met his obligations to his client and bears no responsibility for the issues that arose from his failure to check his own work. Any compensation under the circumstances would be unreasonable; the fees paid to Mr. Niebuhr and the Niebuhr Law Firm in the amount of $365 must be disgorged. 11 U.S.C. §§329(b), 526(c)(2)(A).

## B. Reaffirmation Agreements

Another issue about which the UST complains is the failure of Mr. Niebuhr to follow through with the Debtor regarding her intent to reaffirm several of her debts. As previously stated, the scope of services that Mr. Niebuhr agreed to provide in representing the Debtor in her bankruptcy filing was not limited in any way and therefore necessarily included the negotiation of reaffirmation agreements.[7] Many courts have concluded that negotiation of reaffirmation agreements is "among a set of core services that must be provided to a consumer debtor in order to provide competent representation in a Chapter 7 context." *In re Minardi*, 399 B.R. 841, 849 (Bankr. N.D. Okla. 2009) (collecting cases). This is so because the decision of whether and what debts a debtor should reaffirm is an integral part of the bankruptcy process that directly impacts a debtor's fresh start. *In re Collmar*, 417 B.R. 920, 923 (Bankr. N.D. Ind. 2009) (citations omitted). The decision to reaffirm an otherwise

---

[7] Although the retention agreement between the Debtor and Mr. Niebuhr was not offered as evidence, Mr. Niebuhr acknowledged as much at the hearing. Had Mr. Niebuhr pushed back on the suggestion that his agreement with the Debtor was not limited in scope, it could have hindered the UST's case against Mr. Niebuhr. The best practice in matters concerning transactions between a debtor and their attorney would be for the UST to obtain a copy of the agreement at issue and introduce it into evidence.

dischargeable debt is so critical and fraught with legal consequence that Congress, contemplating debtor's counsel would play a significant role in the process, implemented several safeguards and conditions that must be met for an agreement to be enforceable. *Collmar*, 417 B.R. at 923 (citing 11 U.S.C. §524(c)(3), (k)(3)(J), (k)(5)); *Minardi*, 399 B.R. at 848.

Here, the Debtor stated her intention in her bankruptcy paperwork to reaffirm three otherwise dischargeable debts to retain the property secured by those debts. Based on her filings since the case has been reopened and her testimony at trial, reaffirming the debts remained important to her throughout her case. Nevertheless, no reaffirmation agreements were ever completed and filed within the time to do so. The Debtor's consternation about that fact signals a wide gap between the result she expected and the result that was obtained, begging the question of whether she received adequate representation in that regard. The Court concludes that she did not.

To say that Mr. Niebuhr was not proactive in negotiating reaffirmation agreements for the Debtor would be an understatement. In fact, he did practically nothing to accomplish the Debtor's goals. Despite the Debtor's expressed intention to reaffirm certain debts, Mr. Niebuhr says he relied on the creditors to contact him—at least one of which apparently never did—about preparing the agreements. As the Debtor's discharge date was approaching and the agreements had yet to be fully executed and filed, Mr. Niebuhr did not bother asking for an extension of time. As a result, none of the debts the Debtor intended to reaffirm were reaffirmed.

Even with the assistance of a diligent attorney, a debtor's intent to reaffirm a debt with a particular creditor might not always be fulfilled. Sometimes a debtor is so deeply in default that the creditor declines to reaffirm. Often, creditors are unresponsive, uncooperative, or just slow in working with debtors and their attorneys to prepare, execute, and file reaffirmation agreements. Attorneys for debtors frequently seek extensions of the discharge date under such circumstances to preserve their client's opportunity to timely reaffirm. Such extensions may be granted in a court's discretion. Fed. R. Bankr. P. 4008(a). This Court routinely grants extensions upon motion without the necessity of a hearing.

The Debtor obviously expected and statutory and case law contemplated that Mr. Niebuhr would at least try to negotiate agreements with creditors with respect to the debts the Debtor wanted to reaffirm. *See* 11 U.S.C. §524(c)(3), (k)(3)(J), (k)(5); *Minardi*, 399 B.R. at 849. Mr. Niebuhr's failure to do so violated the mandates of §526 governing debt relief agencies; either he did not provide a fundamental service he agreed to provide or he misrepresented the extent of services that would be provided. 11 U.S.C. §526(a)(1), (3). Given the critical nature of such service and the Debtor's reliance on it, disgorgement of fees is entirely appropriate and required here. 11 U.S.C. §526(c)(2)(A).

Mr. Niebuhr purports to have done some clerical work in preparing the Debtor's Statement of Intention filed with her petition and pushing paper between parties for signature. But those efforts, such as they were, only highlight the problems in this case. Although Mr. Niebuhr's time records show

that he forwarded reaffirmation agreements to his client for signature, there are no entries that would support a finding that he spent any time actually negotiating with creditors or discussing the terms and ramifications of such agreements with his client. Indeed, when asked about the obvious mistake in the Debtor's Statement of Intention where he checked boxes to both redeem property and reaffirm the corresponding debt, Mr. Niebuhr asserted that it must have been the Debtor's intention because she signed the document. Surely, Mr. Niebuhr would have more insight if he had engaged in a meaningful conversation with the Debtor about what she sought to accomplish through bankruptcy, how her goals might be accomplished, and the risks and benefits of proceeding in bankruptcy. Such a conversation clearly never happened, at the expense of Mr. Niebuhr's professional obligations and to the detriment of his client. *See* 11 U.S.C. §526(a)(3); Ill. R. Prof'l Conduct (2010) R. 1.4 (eff. Jan. 1, 2010). Again, disgorgement of the $365 in attorney fees paid by the Debtor to Mr. Niebuhr is appropriate and required.

### *C. Failure to List Creditors*

Another issue brought to light in the reopening of this case was the allegation that some creditors disclosed by the Debtor to Mr. Niebuhr were omitted from her bankruptcy filing. The evidence of what the Debtor did or did not provide to her attorney and whether Mr. Niebuhr in fact failed to include creditors so identified, however, was skimpy and not well-developed at the hearing. The Debtor testified that, after she received her discharge, several

prepetition creditors commenced collection actions against her. Those actions were ultimately dismissed after the Trustee assisted her and provided notice to the creditors that the debts had been discharged. Although it is clear that the names under which the lawsuits were brought do not match any of the creditors listed in the Debtor's bankruptcy paperwork, that fact is not sufficient for the Court to draw the inference that the Debtor disclosed those debts to Mr. Niebuhr and that Mr. Niebuhr failed to include them in the case filing. Based on the limited testimony presented, the Court cannot conclude that Mr. Niebuhr failed to list prepetition creditors of which he had been made aware.

### D. Filing Fee for the Motion to Reopen

Mr. Niebuhr's use of an inaccurate social security number in the Debtor's bankruptcy filing was aggravated by his stubborn refusal to pay the filing fee for reopening the case to fix his mistake. The reopening fee was paid by the Trustee, who filed the Motion to Reopen after the Debtor contacted him for help. That, of course, led to the UST filing her Sanctions Motion now before the Court. But it was Mr. Niebuhr's responsibility to assist his client in correcting the mistake he made in the Debtor's social security number, even if that meant having to incur additional costs to accomplish the task. Thus, it is only fair that Mr. Niebuhr be required to reimburse the Trustee for the costs he incurred by filing the Motion to Reopen.

Bankruptcy Rule 7054(b) provides for the assessment of costs in favor of a prevailing party. Fed. R. Bankr. P. 7054(b); *see also* Fed. R. Civ. P. 54(d). And

while the Court is cognizant of the fact that the rule provisions do not neatly fit the present circumstances—the prevailing party here is the UST, but the Trustee incurred the costs—Bankruptcy Rule 7054(b) nevertheless should be applied in this case to require the reimbursement of the filing fee for the Motion to Reopen to the Trustee.

The UST asks the Court to impose sanctions in this matter, citing §105(a) as providing authority for her request; §105(a) vests bankruptcy courts with broad power to implement the provisions of the Bankruptcy Code and prevent an abuse of process. 11 U.S.C. §105(a). Bankruptcy courts also have inherent authority to regulate attorney conduct and impose sanctions for case-related wrongdoing. *In re Rimsat, Ltd.*, 212 F.3d 1039, 1049 (7th Cir. 2000). And while "[i]t is hornbook law that §105(a) 'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code[,]'" a bankruptcy court operates entirely "within the confines of the Bankruptcy Code" when it uses §105(a) and its inherent powers for purposes that are consistent with the provisions of the statute and rules that alone are not up to the task. *Law v. Siegel*, 571 U.S. 415, 421 (2014) (quoting 2 Collier on Bankruptcy ¶105.01[2], p. 105-06 (16th ed. 2013)); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991); *Disch v. Rasmussen*, 417 F.3d 769, 777 (7th Cir. 2005) (citations omitted).

Bankruptcy Rule 7054 does not explicitly apply in this instance, but the rule also does not expressly prohibit its application here. Other relevant Bankruptcy Code provisions and Rules provide similar guidance. Section 329

and Bankruptcy Rule 2017 govern debtors' financial transactions with their attorneys, providing for disgorgement of amounts paid to an attorney on the debtor's behalf in circumstances like the present that the court determines the amounts paid exceed the reasonable value of services provided. *See* 11 U.S.C. §329(b); Fed. R. Bankr. P. 2017. Section 329 and Bankruptcy Rule 2017 neither explicitly authorize nor explicitly prohibit the reimbursement of costs, but they are both clearly intended to govern payments to a debtor's attorney by or on behalf of the debtor. Bankruptcy Rule 9011, regarding representations to the court, provides for the imposition of sanctions to the extent "sufficient to deter repetition of" violations of the rule or comparable conduct by others similarly situated. Fed. R. Bankr. P. 9011(c)(2). Such sanctions might well include payment of reasonable fees and expenses. Section 526, in turn, provides that debt relief agencies, which attorneys for debtors are, may be liable to debtors for damages, including amounts paid for services and other fees and costs, for failing to meet certain statutory requirements. *See* 11 U.S.C. §526(a)-(c). Like §329 and Bankruptcy Rule 2017, the provisions of §526 clearly pertain to relations between debtors and their attorneys; there is no mention of what relief, if any, may be accorded to aggrieved third parties.

Had the Debtor herself incurred the cost of reopening her bankruptcy case, the Court would have no trouble finding Mr. Niebuhr liable to the Debtor for that amount and ordering him to reimburse her for the same. Mr. Niebuhr's conduct in this case violated each of the Bankruptcy Code sections and Rules discussed, and his efforts to push the financial burden of those violations onto

the Debtor cannot be tolerated. The Debtor only avoided paying the costs because the Trustee paid them. That distinction should not benefit Mr. Niebuhr; he must reimburse the Trustee for the filing fee he paid to reopen the Debtor's bankruptcy case.

Assessing the costs of reopening the Debtor's bankruptcy case against Mr. Niebuhr does not override or contravene the express provisions of the statute or rules. To the contrary, it is entirely consistent with the thrust and spirit of the law. It is also necessary to deter similar conduct in the future. Allowing an attorney to simply refuse to fulfill duties owed to a client at the expense of the client and others would only serve to encourage the type of inaction and neglect of professional obligations exhibited here by Mr. Niebuhr. Mr. Niebuhr must reimburse the Trustee the $260 reopening fee he paid.

## IV. Conclusion

Mr. Niebuhr's conduct in this case and his dismissive attitude regarding his own mistakes is enormously concerning. Mr. Niebuhr has shown nothing but disdain for the Court, his own client, and the legal process. Mr. Niebuhr and the Niebuhr Law Firm have demonstrated a practice of agreeing to represent debtors, largely without limitation, but with no apparent intention of providing the level of attention, thoroughness, or diligence necessary to competently handle the cases. Here, Mr. Niebuhr agreed to represent the Debtor in her bankruptcy filing, made mistakes in preparing her paperwork, and failed to follow up on her reaffirmation agreements before the case was

closed. Then, when his handling of the case caught up with him and he faced putting in additional time and expense to fix his own mistakes, he tried to wash his hands of the situation and disregarded his obligations to his client and the Court. But the legal profession is more than a money-making trade. *Seare*, 493 B.R. at 182. "Lawyers are professionals that owe fiduciary duties to their individual clients, and must continue to represent them even if initially rosy predictions turn sour." *Id.* at 181 (citation omitted).

This Court has previously noted the comparably small fees that the Niebuhrs charge to represent debtors in bankruptcy cases and has explained to them that if, because of their modest fees, it is not feasible for them to provide the basic legal services to which their clients are entitled, they must either stop taking bankruptcy cases or raise their fees. They cannot use their discounted fees to justify discounting the quality of their legal services below the minimum standards of competency and professionalism. So long as the Niebuhrs continue to represent debtors before this Court—regardless of the amounts charged for their services—they will be held to the same professional standards that apply to all attorneys.

Karl Niebuhr will be ordered to disgorge the $365 in attorney fees paid to him by the Debtor. As an additional sanction, Karl Niebuhr will be ordered to reimburse the Trustee for the $260 reopening fee paid. Both Karl Niebuhr and Leann Niebuhr are admonished that the quality of the legal services provided in this case fell well below the minimum standards of competency and professionalism required by the Illinois Rules of Professional Conduct and the

Federal Rules of Bankruptcy Procedure. Going forward, they must actually meet with their clients in person or by video conference, and they must review all bankruptcy paperwork with their clients before a case is filed. Such review must be in sufficient detail to make sure that both they and their clients are in full compliance with all applicable laws and rules and that they have fulfilled all their professional obligations.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###